1

2                       UNITED STATES DISTRICT COURT

3                            DISTRICT OF NEVADA

4                                   * * *

5    ALFRED D. FREHNER,                          Case No. 2:12-cv-02083-APG-PAL

6                  Plaintiff,
                                                 **ORDER GRANTING DEFENDANT'S MOTION**
7         v.                                     **FOR SUMMARY JUDGMENT AND DENYING**
                                                 **MOTION TO DISMISS**
8    CLARK COUNTY SCHOOL DISTRICT,

9                  Defendant.                    (Dkt. Nos. 9, 31)

10

11

12   **I.    BACKGROUND[1]**

13        In 1990, the Clark County School District ("CCSD" or the "District") hired plaintiff

14   Alfred D. Frehner as a teacher.  Frehner was born in 1953.  He alleges he is licensed to teach the

15   following subjects in secondary school: biological science, psychology, physical education,

16   physical science, health education, and mathematics.[2]

17        In the spring of 2010, Dave Wilson ("Wilson"), the then-Principal of Virgin Valley High

18   School ("Virgin Valley") in Mesquite, Nevada, approached Frehner about the classes Frehner

19   would teach during the 2010–2011 school year (the "2010–2011 Classes").  According to

20   Frehner, Wilson explained that many students had not yet passed the Nevada High School

21   Proficiency Exam ("NHSPE") in math and science, and he asked Frehner to teach the preparatory

22   classes for that exam. (Dkt. No. 33 at 4.)  Frehner describes the two classes as "Science

23

24

25   ──────────────

26        [1] The following factual recitation is based on the undisputed facts and the uncontroverted,
     admissible evidence.  Where an alleged fact is based on one party's assertion, that is indicated.

27
         [2] The document which purports to establish Frehner's subject area certifications was not properly
28   authenticated.  (*See* Frehner Ex. 8, Dkt. No. 33 at 41.)

1  Foundation" and "Math Application." (Compl. ¶ 25; Dkt. No. 13 at 4.) CCSD alternatively

2  describes them as "Study Skills" classes. (Dkt. No. 31 at 4, 9.)

3      In August 2010, Frehner alleges he reported to Virgin Valley High School, and that

4  Wilson instructed him to report to the Math Department. (Dkt. No. 33 at 4.)  Frehner asserts that

5  school administrator Vonda Humphrey ("Humphrey") had prepared a "math binder" for him to

6  use during the 2010–2011 year. (*Id.*)  Frehner further asserts he "participated in all math

7  department meetings and activities during the 2010–2011 year." (*Id.* at 4–5.)

8      In September 2010, Frehner alleges he accessed the District's online "PASSPORT"

9  system and that it listed him as teaching a "Study Skills" class. (Dkt. No. 33 at 5.)

10      On April 4, 2011, Frehner asserts, Wilson informed him that his teaching assignment had

11  been eliminated.  Frehner contends that Wilson told him that "there wouldn't be anything for

12  [Frehner at Virgin Valley] next year, unless there was something happen [*sic*] in the math

13  department." (*Id.*)  The District admits that Wilson's position was terminated, explaining that all

14  Study Skills Classes at Virgin Valley were eliminated when the District reduced the teacher

15  allocation for 2011–2012. (Dkt. No. 31 at 13–14.)  Two Study Skills teachers—Frehner and Tim

16  Eyring—were thus moved to the "surplus" list.

17      On April 11, 2011, Frehner filed an "Employee Response"—a sort of internal

18  complaint—with the District.[3] (Dkt. No. 13 at 13.)

19      On April 25, 2011, Dixie Stephens ("Stephens"), the District's Distance Education

20  Coordinator, allegedly told Frehner that Study Skills is part of the Social Studies Department.[4]

21

22      [3] The response is deemed authenticated under FRE 901(b)(7)(A) as a document filed by Frehner with the District pursuant to the Negotiated Agreement. (Frehner Ex. 11, Dkt. No. 33 at 57–58.)

23      [4] Frehner submitted copies of purported e-mails between he and various officials with the Nevada Department of Education ("NDOE") in August 2011 and May 2012 concerning his department

24  assignment. (Frehner Ex. 7, Dkt. No. 33 at 36–39.)  These e-mails were not authenticated and thus the Court cannot consider them. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial

25  court can only consider admissible evidence in ruling on a motion for summary judgment.").  The parties do not state in their briefs whether the emails were produced in the course of discovery, which might

26  satisfy the authenticity requirement. *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir.1996) (documents produced by a party in discovery were deemed authentic when

27  offered by the party-opponent).  The same is true for the purported e-mails between Frehner and several District officials about the same subject matter. (Frehner Ex. 12, Dkt. No. 33 at 60–62.)  Thus, the Court

28  cannot consider these documents.

1  (*Id.* at 68.) The syllabus[5] for "Study Skills" describes it as a "one-year course designed to

2  increase academic success in the skills of critical thinking, reading, listening, writing, and

3  speaking." (*Id.* at 66.) However, Frehner appears to have taught the remedial math and science

4  classes rather than Study Skills, regardless of what title the 2010–2011 Classes were given. (Dkt.

5  No. 31-2 at 2.)]

6       On May 17, 2011, Frehner filed a grievance[6] with the District under the Negotiated

7  Agreement.[7] Frehner expressed concern that Virgin Valley's administration was trying to "cause

8  [his] seniority to become null and void by the use of unethical (and possibly illegal) means."

9  (Dkt. No. 31-2 at 2–3.) He was upset that Virgin Valley:

10      affixed the class name of "Study Skills – 4110" (an elective class belonging to the
   Social Studies Department) to the five classes associated with preparing for the

11      NHSPE, they have indicated that only the name of the class, not the content,
   determines a teachers' assignment, therefore, they do not consider me to be part of

12      the math or science department.

13  (*Id.* at 2.) Notably, Frehner made no mention, either direct or indirect, of age or age

14  discrimination in this grievance. In response to the grievance, on June 14, 2011 the Clark County

15  Educators Association ("CCEA")—the teachers' representative for collective bargaining

16  purposes—sought to arbitrate the grievance. (Juhasz Decl., Dkt. No. 31-2 at 6:13–16, 30.) On

17  July 14, 2011, the CCEA changed its mind and withdrew its demand to arbitrate Frehner's

18  grievance. (Dkt. No. 31-2 at 29.)

19       Frehner asserts that in June 2011 he printed a copy of the Virgin Valley Staff Handbook

20  for 2010–2011 from the District's website.[8] (Dkt. No. 33 at 4–5.) The Handbook allegedly lists

21  Frehner as a member of the "Electives" department. (*See id.*) Frehner's department assignment is

22  relevant insofar as it affects the determination of which other teachers were "similarly situated" to

23

24

25      [5] The syllabus may be considered self-authenticating under Federal Rule of Evidence 902(5).

26      [6] (CCSD Ex. 7, Dkt. No. 31-2 at 2–3.) The grievance is deemed authenticated under FRE 901(b)(7)(A) as a document filed by Frehner with the District pursuant to the Negotiated Agreement.

27      [7] The "Negotiated Agreement" is the relevant collective bargaining agreement between the teachers' union and the District. (CCSD Ex. 8, Dkt. No. 31-2 at 8–27.)

28      [8] The Handbook may be considered self-authenticating under Federal Rule of Evidence 902(5).

1    Frehner for purposes of an age discrimination analysis.  Frehner argues that, to decide which

2    teachers to surplus, the District should have compared him to all other teachers in the Math

3    Department (or, alternatively, the Social Studies Department), on the basis of seniority.  The

4    District contends that Frehner taught Study Skills and therefore the relevant comparison is with

5    Eyring, the other Study Skills teacher, or with Eyring and Jan Stroup ("Stroup"), the other two

6    similarly-aged teachers who were surplussed.

7         For the 2011–2012 school year, the District alleges that Wilson found a position for

8    Eyring at Virgin Valley as a special education teacher because Eyring is licensed to teach that

9    subject. (Dkt. No. 31 at 4.)  Wilson allegedly moved to Chaparral High School for the 2011–2012

10   school year and Stroup went with him to teach there. (*Id.* at 4–5.)

11        Frehner alleges that through the surplus process, he was transferred to another high school

12   far from his home in Mesquite, Nevada.  He contends the new position added about two-and-a-

13   half hours of commuting time each workday. (Dkt. No. 33 at 9.)  The District merely admits that

14   Frehner taught at a school other than Virgin Valley during 2011–2012.

15        The Negotiated Agreement governs involuntary transfers through the surplus process.  In

16   relevant part, Article 35-3 provides:

17        Seniority ranking and the licensure on the seniority list . . . will determine the
          teacher(s) to be involuntarily transferred.  The teacher with the lowest seniority
18        ranking will be transferred unless otherwise provided in this Article.

19        * * *

20        A list of all vacancies in the School District shall be provided to each teacher who
          will participate in the involuntary placement process.  All teachers identified for
21        involuntary transfer shall meet in one central location to choose, *in order of
          seniority ranking*, an assignment for which they are licensed from the list of
22        vacancies.

23        * * *

24        At the secondary level, involuntary transfers shall be by *department*.  A teacher
          may not cause a teacher with less seniority in another department to be
25        involuntarily transferred or to secure a vacant position in a department other than
          the one the teacher was assigned to teach in.
26
          * * *
27

28

4

In the event that there is no vacancy available for which the teacher subject to involuntary transfer is licensed, the provisions of Article 30 (Reduction in Force) will apply.

* * *

Teachers who are reassigned through an involuntary transfer in the Spring of each contract year shall have the following rights: . . .

Shall have the right to return to the previously assigned school if a vacancy should occur for which the teacher is licensed in the department from which the teacher was surplussed, not later than the fourth Friday of September of each contract year.

(Dkt. No. 9-1 at 17–18 (emphasis supplied).)

The Reduction in Force ("RIF") provision, Article 30, provides that "[a]ny . . . teachers to be reduced in force from the area or areas affected shall be reduced in force on the basis of districtwide seniority." (*Id.* at 12.) Districtwide seniority, in turn, is based on "the length of seniority in licensed service" and is calculated from "the first day the employee reported to work for pay in the . . . District." (*Id.* at 13.) On the face of the RIF provisions, there is no correlation between layoffs and a teacher's presence on the surplus list.

On March 2, 2012, Frehner filed a Charge of Discrimination (the "EEOC Charge") with the federal Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 1-3 at 2–3.) He contended that (i) on or about April 4, 2011, Wilson informed him that his assignment at Virgin Valley was eliminated without giving a specific reason; (ii) in 2011–2012, Frehner was teaching at a different high school; (iii) the 2011–2012 school year started with two math vacancies at Virgin Valley; (iv) two long-term substitutes without math certifications filled those vacancies; (v) Mikkelson told Frehner that he would never be considered for any position at Virgin Valley; (vi) the District "practiced unfair manipulation of transfer procedures, in order to justify placing me on the surplus list"; (vii) "[t]he district is systematically removing older teachers from the workforce, by placing them on the surplus list. Teachers on the surplus list are first to be laid off"; and (viii) he filed a complaint with the Nevada Equal Rights Commission ("NERC") on December 14, 2011 (the "State Charge"). (*Id.*) Frehner asserted that the District's actions violated the federal Age Discrimination in Employment Act of 1967 ("ADEA")[9] and Nevada

---

[9] 29 U.S.C. §§ 621–634.

1   state law. He indicated in the EEOC Charge that the alleged discrimination was based on age, but

2   he did not check the box to indicate discrimination based on retaliation. (*Id.* at 2.) The alleged

3   dates of discrimination were April 4, 2011 through January 31, 2012.

4          On September 5, 2012, the EEOC issued a right-to-sue letter, informing Frehner that the

5   EEOC would not bring charges against the District and that he had 90 days following receipt of

6   the letter in which to file suit against the District.[10] (Dkt. No. 1-2 at 2.)

7          On December 6, 2012, Frehner filed suit in this Court. He claims (1) age discrimination

8   under the ADEA; (2) "public policy tort," which appears to be a claim for wrongful termination

9   in violation of public policy; (3) respondeat superior; (4) negligent hiring, supervision, and/or

10  training of employees; (5) retaliation in violation of 42 U.S.C. § 2002e-3; (6) age discrimination

11  under the Nevada Equal Employment Opportunity Act, NRS § 633.310 et seq.; and (7) intentional

12  infliction of emotional distress. (Dkt. No. 1; Dkt. No. 9 (explaining that the claims under Title VII

13  in the Complaint should have been labeled as under the ADEA).)

14         Frehner's legal theory seems to be that the District mistreated him by mislabeling his

15  2010–2011 classes as "Social Skills," even though the courses' content was math and science,

16  and by relying on this labeling to treat Frehner as a member of the Electives Department and/or

17  the "Social Skills" Department (a department of two teachers)—rather than the Math

18  Department—for the purpose of determining which teachers should be surplussed. Frehner

19  alleges this "manipulation" of course names and department organization was the District's

20  "systematic" method of moving older teachers onto the surplus list with the goal of putting them

21  closer to layoff in the event of a districtwide reduction in force. He contends being surplussed

22  harmed him in two ways. First, he was compelled to take a teaching job in the Las Vegas

23  metropolitan area, which requires more than two hours of additional commuting time each day

24  (compared to Virgin Valley), plus additional costs for gas, maintenance, and related items.

25  Second, he asserts being on the surplus list makes being laid off more likely.

26

27

28         [10] The 90-day deadline is established by 42 U.S.C. § 2000e-5(f)(1).

1   In January 2013, CCSD moved to dismiss Frehner's complaint under Rule 12(b)(6). (Dkt.

2   No. 9.) The District's arguments are repeated in its later-filed motion for summary judgment. In

3   May 2013, the Court granted the motion to withdraw filed by Frehner's counsel. (Dkt. No. 20.)

4   Since then, Frehner has represented himself pro se.  Discovery closed at the end of July 2013.

5   On September 26, 2013, CCSD filed a motion for summary judgment with attached

6   exhibits. (Dkt. No. 31.) As to the ADEA discrimination claim, the District argues that Frehner

7   did not suffer an "adverse employment event" as required by the statute, and that there is

8   insufficient evidence to support an inference of age discrimination.  As to the ADEA retaliation

9   claim, the District argues that Frehner failed to exhaust his administrative remedies, that he did

10   not engage in a "protected activity," and that there is insufficient evidence of a causal link

11   between the alleged protected activity and the alleged adverse employment action.  Concerning

12   the state law claims, the District contends that (i) the "public policy tort" fails because Frehner

13   was not terminated and because it does not apply to age discrimination; (ii) respondeat superior is

14   not a cause of action, but rather a theory of liability; (iii) negligent hiring/supervision/training

15   fails because an employee covered by a collective bargaining agreement (the "Negotiated

16   Agreement") may not litigate tort claims which require interpreting the agreement, this tort

17   applies only when a third-party is injured, discretionary immunity under Nevada law protects the

18   District, and there is no evidence to support this claim; and (iv) the IIED claim is also preempted

19   by the Negotiated Agreement, subject to discretionary immunity, and unsupported by the

20   evidence.

21   Frehner responded to CCSD's motion with attached exhibits. (Dkt. No. 33.)  Although

22   difficult to understand, Frehner's brief seems to reiterate his arguments from the Complaint and

23   his response to the motion to dismiss.  Notably, he contends that "under the rules of the State of

24   Nevada and the [CCSD], [he] was protected from any possibility of surplus in the 2010–2011

25   school year[.]" (*Id.* at 9.) He then states that "every young employee at Virgin Valley . . . was

26   protected from any possibility of being selected from surplus, which is established to have the last

27   in be the first out." (*Id.*)  He appears to be conveying that the surplussing system was backward in

28   that the less senior teachers were given priority over the more senior teachers.

1   The District replied with attached exhibits. (Dkt. No. 36.)  The District reiterates its

2   substantive arguments, and also contends that the vast majority of Frehner's evidence submitted

3   with his response brief is inadmissible as unauthenticated and/or consisting of unexcepted

4   hearsay.

6   **II.    ANALYSIS**

7       **A.    Summary Judgment Standard**

8       The Federal Rules of Civil Procedure provide for summary adjudication when the

9   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

10   affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is

11   entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Material facts are those that may

12   affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

13   dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

14   return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if

15   reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict

16   in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th

17   Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A

18   principal purpose of summary judgment is "to isolate and dispose of factually unsupported

19   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

20       In determining summary judgment, a court applies a burden-shifting analysis.  "When the

21   party moving for summary judgment would bear the burden of proof at trial, it must come

22   forward with evidence which would entitle it to a directed verdict if the evidence went

23   uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the

24   absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage*

25   *Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast,

26   when the nonmoving party bears the burden of proving the claim or defense, the moving party

27   can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the

28   nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a

8

1   showing sufficient to establish an element essential to that party's case on which that party will

2   bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24. If the moving party fails to

3   meet its initial burden, summary judgment must be denied and the court need not consider the

4   nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

5          If the moving party satisfies its initial burden, the burden then shifts to the opposing party

6   to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith*

7   *Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the

8   opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient

9   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

10   differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

11   F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary

12   judgment by relying solely on conclusory allegations that are unsupported by factual data. *See*

13   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the

14   assertions and allegations of the pleadings and set forth specific facts by producing competent

15   evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

16          At summary judgment, a court's function is not to weigh the evidence and determine the

17   truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

18   The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in

19   his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not

20   significantly probative, summary judgment may be granted. *See id.* at 249–50.

21          **B.      Admissibility of Evidence**

22          "A trial court can only consider admissible evidence in ruling on a motion for summary

23   judgment." *Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see* FED. R. CIV. P.

24   56(e). "Authentication is a condition precedent to admissibility, and this condition is satisfied by

25   'evidence sufficient to support a finding that the matter in question is what its proponent claims.'

26   . . . [U]nauthenticated documents cannot be considered in a motion for summary judgment." *Id.*

27   (quoting FED. R. EVID. 901(a)). In a summary judgment motion, documents authenticated

28   through personal knowledge must be "attached to an affidavit that meets the requirements of

1  [Fed. R. Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be

2  admitted into evidence." *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

3    Except for the documents discussed above as self-authenticating, none of Frehner's

4  exhibits was authenticated, and thus the Court cannot consider them. Moreover, the following

5  Frehner exhibits would be inadmissible even if they were properly authenticated: Exs. 1–4, copies

6  of Nevada statute (unnecessary, the Court has access to current Nevada statute); Ex. 7, e-mails

7  between Frehner and various officials with the Nevada Department of Education (inadmissible

8  hearsay under Evidence Rule 801, not excepted as statements by a party opponent because the

9  defendant is the Clark County School District, not the state Department of Education); Ex. 11,

10  "Employee Response" complaint form (inadmissible hearsay under Evidence Rule 801, not a

11  statement by a party opponent because Frehner offers his own prior statements), Ex. 15, another

12  e-mail between Frehner and an official from the Nevada Department of Education (inadmissible

13  hearsay under Evidence Rule 801).

14    The following CCSD exhibits are not authenticated: Ex. 5, Frehner's complaint letter of

15  October 11, 2007 and CCSD's response (Dkt. No. 31-1 at 17–22); Ex. 6, Frehner's deposition

16  (Dkt. No. 31-1 at 24–52); ; Ex. 9, e-mail from Rhonda Fields, of CCSD, to Frehner (Dkt. No. 31-

17  2 at 32). Of these, CCSD Ex. 9, even if properly authenticated, would not be admissible for the

18  truth of Fields's statements because she is not a party opponent, and there is no applicable hearsay

19  exception. See FED. R. EVID. 801–803.

20    For the reasons set forth below, however, even if the unauthenticated and inadmissible

21  exhibits were considered by the Court, the outcome of this Order would not differ.

22    **C. Federal Claims**

23      **1. ADEA Discrimination Claim**

24  Under the ADEA,

25  It shall be unlawful for an employer--

26  (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate
   against any individual with respect to his compensation, terms, conditions, or
27  privileges of employment, because of such individual's age; [or]

28

10

1

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]

2

29 U.S.C. § 623(a).

3

4

Frehner's theory of ADEA liability is disparate treatment. The fundamental allegation in

5

an ADEA disparate treatment claim is that "the employer simply treats some people less

6

favorably than others because of . . . [age]." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609

7

(1993) (internal quotation marks and citation omitted). "Proof of discriminatory motive is

8

critical, although it can in some situations be inferred from the mere fact of differences in

treatment." *Id.* (internal quotation marks and citation omitted).

9

"[T]here is no disparate treatment under the ADEA when the factor motivating the

10

employer is some feature other than the employee's age." *Id.* "When the employer's decision is

11

wholly motivated by factors other than age, the problem of inaccurate and stigmatizing

12

stereotypes disappears. This is true even if the motivating factor is correlated with age[.]" *Id.* at

13

611.

14

15

[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

16

17

18

*Gross v. FBL Fin. Servcs., Inc.*, 557 U.S. 167, 180 (2009). "Unlike Title VII, the ADEA's text

19

does not provide that a plaintiff may establish discrimination by showing that age was simply a

20

motivating factor." *Id.* at 175.

21

22

In general, discrimination can be established in either of two ways—by direct evidence, or by indirect evidence. . . . If a plaintiff has no direct evidence, she may prove discrimination by using indirect, or circumstantial evidence, under the three-stage burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). . . . Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by showing that she belongs to a protected class, that she was performing her job satisfactorily (or was qualified for a position for which she applied), that she was subject to an adverse employment action, and that similarly situated individuals outside the protected class were treated more favorably[.]

23

24

25

26

27

28

11

1    *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1057 (N.D. Cal. 2011) (citations omitted). The

2    *McDonnell Douglas* test is flexible and adaptable to each case's unique facts. *Id.* (citing *Tex.*

3    *Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981)). The Ninth Circuit has

4    articulated the burden-shifting analysis for the summary judgment context:

5        [T]o survive summary judgment on his claim for a violation of the ADEA under
         the disparate treatment theory of liability, [plaintiff] must first establish a prima
6        facie case of age discrimination. . . . If he is successful, the burden of production
         shifts to [defendant] to articulate a legitimate non-discriminatory reason for its
7        adverse employment action. . . . It is then [plaintiff's] task to demonstrate that
         there is a material genuine issue of fact as to whether the employer's purported
8        reason is pretext for age discrimination. . . . At trial, he must carry the burden to
         prove that age was the "but-for" cause of [the adverse employment action].
9

10   *Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012) (citations omitted).

11       "A 'prima facie case requires evidence adequate to create an inference that an

12   employment decision was based on a[n] [illegal] discriminatory criterion.'" *Id.* (quoting

13   *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (alterations in original)).

14   However,

15       [t]he requisite degree of proof necessary to establish a prima facie case for . . .
         ADEA claims on summary judgment is *minimal* and does not even need to rise to
16       the level of a preponderance of the evidence. . . . The plaintiff need only offer
         evidence which gives rise to an inference of unlawful discrimination. . . . The
17       amount of evidence that must be produced in order to create a prima facie case is
         very little. . . . Establishment of the prima facie case in effect creates a
18       presumption that the employer unlawfully discriminated against the employee.

19   *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (emphasis supplied).

20       The employer's burden at the second phase "is one of production, not persuasion; it can

21   involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143

22   (2000). If the employer meets this burden, the presumption created by the prima facie case

23   disappears and the burden shifts back to the plaintiff. *Wallis*, 26 F.3d at 885.

24       "The plaintiff can prove pretext (1) indirectly, by showing that the employer's proffered

25   explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not

26   believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

27   employer. . . . All of the evidence—whether direct or indirect—is to be considered

28   cumulatively." *Shelley*, 666 F.3d at 609 (internal quotation marks and citation omitted). If the

1   plaintiff's evidence is indirect (circumstantial), it must be "specific and substantial" to create a

2   genuine issue of material fact. *Id.* (citing *Cornwall v. Electra Cent. Credit Union*, 439 F.3d 1018,

3   1029 (9th Cir. 2006)). "To establish a prima facie case based solely on statistics, let alone raise a

4   triable issue of fact regarding pretext, the statistics must show a stark pattern of discrimination

5   unexplainable on grounds other than age." *Coleman*, 232 F.3d at 1283.

6        "Although intermediate evidentiary burdens shift back and forth under this framework, the

7   ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

8   against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (internal

9   quotation marks and citation omitted).

10            **a.**    **Prima Facie Case**

11        At 59 years of age, Frehner is in a protected class under the ADEA. 29 U.S.C. § 631(a).

12   There is no dispute about whether Frehner performed his job duties satisfactorily. The key issues

13   then are (1) whether Frehner suffered an adverse employment action; and (2) whether similarly

14   situated individuals outside the protected class (those under 40 years old) enjoyed favorable

15   treatment.

16        "[A]n adverse employment action is one that 'materially affect[s] the compensation,

17   terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080,

18   1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115,

19   1126 (9th Cir. 2000)). Whether an employee suffered an adverse employment action is a question

20   of fact. *See Trent v. Valley Elec. Ass'n, Inc.*, 195 F.3d 534, 537 (9th Cir. 1999). Frehner asserts

21   two adverse employment actions: first, that being on the surplus list placed him at higher risk of

22   layoff, and, second, that he was compelled to commute more than two extra hours each day. As

23   to the risk of layoff, the Negotiated Agreement explains that layoffs are determined on a

24   districtwide seniority basis with no consideration of a teacher's presence on the surplus list.

25   Frehner has not submitted any evidence to prove that the District's practice is any different than

26   what the Negotiated Agreement mandates. Thus, mere presence on the surplus list does not

27   materially affect the conditions or privileges of his employment; he has apparently lost none of

28   his privileges of tenure. *Davis*, 520 F.3d at 1089.

1    The District of Arizona has held that an increase in commute time, in and of itself, does

2    not constitute an adverse employment action; it is a relevant factor though if there are other

3    considerations. *E.E.O.C. v. Sw. Furniture of Wis., LLC*, 703 F. Supp. 2d 971, 975 (D. Ariz. 2010)

4    (increase from 12 miles to 32 miles each way). The Tenth Circuit has held similarly. *Sanchez v.*

5    *Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (increase from seven minutes to forty

6    minutes each way). "A mere inconvenience or alteration of job responsibilities" is insufficient to

7    establish an adverse employment action. *Id.* This Court agrees that a longer commute, in and of

8    itself, does not materially affect the conditions of employment.[11] *See Davis*, 520 F.3d at 1089.

9    Frehner argues that the added commute results in greater costs for fuel and maintenance; these are

10    not independent harms but rather part-and-parcel of a longer commute.

11    Thus, Frehner has failed to establish a prima facie case because he has not suffered an

12    adverse employment action.

13    Even if he had suffered an adverse employment action, he has not submitted any evidence

14    to prove that similarly situated persons under 40 years old received favorable treatment.

15    Although the evidentiary burden is minimal, Frehner cannot get by with unsupported allegations

16    alone. *See Wallis*, 26 F.3d at 889. In his EEOC Charge, Frehner alleged that two long-term

17    substitutes without math credentials took two vacant spots at Virgin Valley. The inference is that

18    Frehner should have received one of these two spots based on his seniority. Yet Frehner does not

19    submit any evidence of these substitutes' age. Also in the EEOC Charge, he alleged that the

20    district is "systematically removing the older teachers from the workforce." But he offers no

21    evidence to support how younger teachers are treated any differently than older teachers.

22    The only statistics alleged by Frehner are that two licensed teachers out of the 343

23    surplussed teachers who were invited to attend the reassignment/surplus meeting on May 11,

24    2011 had their area of assignment recorded as "Study Skills." Even if this were supported by

25

26    _____

27    [11] This is especially true in this factual context, where Frehner opted to teach in a geographically vast school district and live at the far northern edge of that district. Because the vast majority of the secondary schools in the District are within or closer to the Las Vegas metropolitan area, any transfer

28    likely would have resulted in a significantly longer commute for Frehner.

14

1  evidence, which it is not, it would not prove anything about how the younger teachers fared in the

2  surplussing. That two out of 343 teachers were from a particular subject area is raw data

3  unmoored to any notion of age discrimination, even if those two teachers were over 40 years old.

4  *See Coleman*, 232 F.3d at 1283 ("To . . . raise a triable issue of fact regarding pretext, the

5  statistics must show a stark pattern of discrimination unexplainable on grounds other than age.");

6  *Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (Raw data, "without more, is not competent to

7  prove anything.").

8       Frehner vigorously argues that he should have been considered as part of the Math

9  Department, or alternatively the Social Studies department, for the purpose of surplussing.

10  Instead, the District apparently treated him as part of the Electives Department or the Social Skills

11  Department. The Negotiated Agreement explains that surplussing is organized by department. If

12  Frehner were part of the Math or Social Science Departments, he argues, then he would not have

13  been surplussed because he is senior to several members of those departments. His argument

14  fails for two reasons. First, he has not submitted any admissible evidence to prove that he was

15  actually in the Math or Social Science Departments. Nonetheless, there is a genuine dispute,

16  based solely on the parties' arguments, as to which department he belonged during the 2010–2011

17  school year. Second, and more importantly, even if he were part of the Math or Social Science

18  Departments, there is no evidence that teachers under 40 years old in those departments were

19  protected from surplus. In other words, the dispute about department assignment is not *material*

20  because its outcome is meaningless without additional evidence of the age of those who were not

21  surplussed. FED. R. CIV. P. 56(a). Frehner's arguments focus on seniority (Compl. ¶ 39; Dkt. No.

22  33 at 7.), which is an insufficient proxy for age to establish age discrimination. *See Hazen*, 507

23  U.S. at 608–09.

24

25

26

27

28

1    There is insufficient evidence to give rise to an inference of age-based discrimination

2    against Frehner. *Shelley*, 666 F.3d at 608. Thus, Frehner has failed to establish a prima facie case

3    of age discrimination.[12]

4                              b.      **Legitimate, Nondiscriminatory Reason**

5    If Frehner had established a prima facie case, the Court would next consider whether the

6    District had a legitimate, non-discriminatory reason to place Frehner on the surplus list. The

7    District has met this burden. The District's explanation is sound—that it cannot control its budget

8    or the number of students at each school, which necessitates some method to transfer teachers to

9    other schools where they are needed. The Negotiated Agreement obviously foresaw this yearly

10   migration and included provisions to deal with it. The choice to eliminate "Study Skills" classes

11   so as not to interfere with other subject areas seems within the District's discretion. The District

12   then needed to relocate the affected teachers and placed them on the surplus list. Even if this

13   practice somehow violated the Negotiated Agreement or was otherwise subjectively "unfair" in

14   Frehner's eyes, the reasons underlying it do not facially violate the ADEA.

15                             c.      **Pretext**

16   If Frehner's claim survived this far, it would go no further because he has not put forth

17   any evidence to establish a genuine issue of fact concerning pretext. As discussed above, he has

18   submitted no evidence (admissible or otherwise) that creates even an inference of age-based

19   discrimination. This lack of evidence certainly cannot amount to the "specific and substantial"

20   evidence required to survive summary judgment on the pretext issue. *Shelley*, 666 F.3d at 609. In

21   other words, Frehner has not created a genuine dispute of fact about whether the District's

22   proffered explanation is "unworthy of credence" or whether age-based discrimination more likely

23   motived the District's decision to surplus him. *Id.*

24

25

26            [12] Even if the Court were to consider Frehner's inadmissible exhibits that allegedly establish a
     genuine dispute of fact as to which department he was in, Frehner still would be unable to establish that
27   similarly situated teachers under the age of 40 were treated favorably.

28

                                                    16

1    Even assuming, *arguendo*, that Frehner were correct and that he should have been treated

2    as part of the Math Department, there is no evidence that the District's choice to surplus him on

3    the basis of teaching "Social Skills" rather than by evaluating the Math Department as a whole

4    was based on age. Put another way, even if surplussing "Social Skills" teachers was done to

5    target Frehner, there is no indication that his age had any bearing on the District's decision.

6        The Court thus grants summary judgment in CCSD's favor on the ADEA discrimination

7    claim.

8                    **2.      ADEA Retaliation Claim**

9        "To establish a claim of retaliation [under the ADEA], a plaintiff must prove that (1) the

10   plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action,

11   and (3) there was a causal link between the plaintiff's protected activity and the adverse

12   employment action." *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007).

13       To determine whether an employee's conduct constitutes "protected activity" under the

14   ADEA,

15           The court must balance the purpose of the [ADEA] to protect persons engaging
             reasonably in activities opposing . . . discrimination, against Congress' equally
16           manifest desire not to tie the hands of employers in the objective selection and
             control of personnel. . . . An employee's opposition activity is protected only if it
17           is reasonable in view of the employer's interest in maintaining a harmonious and
18           efficient operation.

19   *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (internal

20   quotation marks and citations omitted). The underlying issue is whether the employer was

21   reasonably on notice that the employee was complaining about age discrimination, but there is no

22   precise form that the employee's complaint must take. *Bahri v. Home Depot USA, Inc.*, 242 F.

23   Supp. 2d 922, 958 (D. Or. 2002); *see Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d

24   276, 291–92 (2d Cir. 1998) ("[I]mplicit in the requirement that the employer have been aware of

25   the protected activity is the requirement that it understood, or could reasonably have understood,

26   that the plaintiff's opposition was directed at conduct prohibited by [the ADEA].");  *Scheitlin v.*

27   *Freescale Semiconductor, Inc.*, 2010 WL 2232200 at *7 (D. Ariz. 2010) ("An employee

28

1    complaining of age discrimination in violation of the ADEA must reasonably put his employer on

2    notice that he is engaging in protected activity, but he need not utter magic words.").

3          Filing an age discrimination complaint with the EEOC is a protected activity. *See Poland*,

4    494 F.3d at 1180–81.

5          "The definition of an adverse employment action for the purposes of a retaliation claim is

6    broader than that for a disparate treatment discrimination claim." *Campbell v. Knife River Corp.--*

7    *Nw.*, 783 F. Supp. 2d 1137, 1154 (D. Or. 2011). "An adverse employment action [for purposes of

8    an ADEA retaliation claim] is any adverse treatment that is based on a retaliatory motive and is

9    reasonably likely to deter the charging party or others from engaging in protected activity."

10    *Poland*, 494 F.3d at 1180–81 (internal quotation marks and citation omitted).

11             [A] wide array of disadvantageous changes in the workplace constitute adverse

12             employment actions. While "mere ostracism" by co-workers does not constitute an
adverse employment action . . . , a lateral transfer does. . . . Transfers of job duties

13             and undeserved performance ratings, if proven, would constitute adverse
employment decisions. . . . [A] transfer to another job of the same pay and status
may constitute an adverse employment action.

14    *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) (internal quotation marks and citations omitted).

15    However, "reassignment of job duties is not automatically actionable. Whether a particular

16    reassignment is materially adverse depends upon the circumstances of the particular case, and

17    should be judged from the perspective of a reasonable person in the plaintiff's position,

18    considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71

19    (2006) (internal quotation marks and citation omitted).

20          "At the prima facie stage of a retaliation case, the causal link element is construed broadly

21    so that a plaintiff merely has to prove that the protected activity and the negative employment

22    action are not completely unrelated." *Poland*, 494 F.3d at 1180 n.2.

23          In spite of this broad standard, Frehner fails to establish a prima facie case for retaliation

24    because there is no evidence (admissible or otherwise) to prove that he engaged in protected

25    activity. His EEOC Charge came after the alleged retaliation. In the EEOC Charge, he alleged

26    that he filed a complaint with the Nevada Equal Rights Commission on December 14, 2011. (Dkt.

27    No. 1-3 at 2, the "State Charge.") Frehner did not submit a copy of the State Charge, so the Court

28

1    does not know whether it alleged age discrimination. But even if it did, his placement on the
2    surplus list and school transfer occurred in the spring of 2011—about six months before he filed
3    the State Charge. Also, by December 2011, Frehner had lost the right to transfer back to Virgin
4    Valley because, under the Negotiated agreement, an involuntarily transferred teacher only has the
5    right to return to her previously assigned school before the fourth Friday of September (some
6    three months before the date of the State Charge). (Dkt. No. 9-1 at 18.) After that day in
7    September, return transfers are permissive. And Frehner has not alleged, let alone provided any
8    evidence, that the District prevented his return to Virgin Valley in retaliation for filing the State
9    Charge.

10   Frehner contends that the District retaliated against him for filing several internal
11   complaints in October 2007, April 2011, and May 2011—long before he filed the administrative
12   charges. (CCSD Exs. 5, 7, Dkt. Nos. 31-1 at 17–20, 31-2 at 2–3; Frehner Ex. 11, Dkt. No. 33 at
13   57–58.) Even if these exhibits were properly authenticated and admissible, they would not
14   establish any protected activity because they merely complain of mistreatment on the basis of
15   seniority. Seniority is not sufficiently correlated with age such that Frehner's complaints
16   reasonably put CCSD on notice that he was protesting illegal age discrimination. *See Hazen*, 507
17   U.S. at 608–09 ("We now clarify that there is no disparate treatment under the ADEA when the
18   factor motivating the employer is some feature other than the employee's age."); *Arnett v. Cal.*
19   *Pub. Employees Ret. Sys. (PERS)*, 179 F.3d 690, 694 (9th Cir. 1999) ("[A]ge is 'analytically
20   distinct' from years of service because a younger employee 'may have worked for a particular
21   employer his entire career, while an older worker may have been newly hired.'" (quoting *Hazen*,
22   507 U.S. at 611)), *vacated on other grounds*, 528 U.S. 1111 (2000). Based on the content of
23   Frehner's internal complaints, no reasonable jury could find that CCSD should have known that
24   Frehner was protesting illegal age discrimination.

25   Although Frehner's job transfer, and resultant substantial extra commute time, may
26   constitute an adverse employment action under the more lenient standard in the retaliation
27   context, his retaliation claim fails because he did not engage in any "protected activity." The
28   Court thus grants summary judgment in CCSD's favor on this claim.

1

2

### D.     State Law Claims

#### 1.     Public Policy Tort

3       "The essence of a tortious discharge is the wrongful, usually retaliatory, interruption of

4   employment by means which are deemed to be contrary to the public policy of this state."

5   *D'Angelo v. Gardner*, 819 P.2d 206, 216 (Nev. 1991). "Tortious discharge[] may arise when an

6   employer dismisses an employee in retaliation for the employee's doing of acts which are

7   consistent with or supportive of sound public policy and the common good." *Id.* Tortious

8   discharge is an exception to the at-will doctrine of employment. *See id.* at 211–212.

9       Frehner's claim fails for two reasons. First, the District has not discharged Frehner; he

10   remains in the District's employ. Second, under Nevada law, "impermissible discrimination

11   cannot be vindicated through a tortious discharge public policy tort, but rather, must be pursued

12   through statutory remedies." *Herman v. United Brotherhood of Carpenters & Joiners of Am.,*

13   *Local Union No. 971*, 60 F.3d 1375, 1385 (9th Cir. 1995) (citing *Sands Regent v. Valgardson*,

14   777 P.2d 898, 900 (Nev. 1989)). Therefore, summary judgment is granted in the District's favor

15   on this claim.

16

#### 2.     Respondeat Superior

17       Frehner has asserted a claim for vicarious liability, but this is a theory of liability, not an

18   independent cause of action. *See, e.g.*, *Fernandez v. Penske Truck Leasing Co.*, 2012 WL

19   1832571 at *1 n.1 (D. Nev. May 18, 2012) ("Respondeat superior is a theory of holding an

20   employer vicariously liable for the torts of its employee, it is not an independent cause of

21   action."). Accordingly, summary judgment is granted in the District's favor on this claim.

22

#### 3.     Negligent Hiring, Supervision, and/or Training of Employees

23       CCSD correctly demonstrates that Frehner has not submitted any evidence to support his

24   naked, conclusory assertion that the District should have known of the propensity of its

25   supervisors and employees to commit age discrimination. *See Celotex*, 477 U.S. at 323–24. In

26   response, Frehner has not offered any evidence (admissible or otherwise) to support his assertion

27   such that a reasonable jury could find in his favor. There is simply no evidence of what the

28   District knew or did not know about its employees before hiring them with regard to their alleged

20

1 | predisposition to discriminate on the basis of age. Therefore, summary judgment is granted in

2 | CCSD's favor on this claim.

### 4. Age Discrimination under NRS § 613.330 et seq.

In relevant part, NRS § 613.330 provides:

[I]t is an unlawful employment practice for an employer:

(a) To fail or refuse to hire or to discharge any person, or otherwise to discriminate against any person with respect to the person's compensation, terms, conditions or privileges of employment, because of his or her . . . age . . . ; or

(b) To limit, segregate or classify an employee in a way which would deprive or tend to deprive the employee of employment opportunities or otherwise adversely affect his or her status as an employee, because of his or her . . . age . . . .

The inquiry under this statute is essentially identical to that performed under the ADEA. *See Apeceche v. White Pine County*, 615 P.2d 975, 977 (Nev. 1980) (articulating the *McDonnell-Douglas* burden-shifting analysis). Accordingly, for the reasons set forth above in the ADEA analysis, summary judgment is granted in the District's favor on this claim.

### 5. Intentional Infliction of Emotional Distress

"The elements of a cause of action for intentional infliction of emotional distress are: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Shoen v. Amerco, Inc.*, 896 P.2d 469, 476 (Nev. 1995) (internal quotation marks and citation omitted). Extreme and outrageous conduct is conduct "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent–A–Car*, 953 P.2d 24, 26 (Nev. 1998) (internal quotation marks and citation omitted). "Discriminatory employment practices are wrong and federal law makes such conduct unlawful and provides for relief; however, the tort of intentional infliction of emotional distress is not intended to reach every discrimination claim." *Alam v. Reno Hilton Corp.*, 819 F.Supp. 905, 911 (D. Nev. 1993).

Frehner's allegations of misconduct do not even approach the requisite standard. Even if the District acted to intentionally harm him by increasing his commute by several hours—a

21

finding the Court does not make—driving several extra hours is not "outside all possible bounds of decency" or "regarded as utterly intolerable in a civilized community." A reasonable jury could not find to the contrary. The Court thus grants summary judgment in CCSD's favor on this claim.

## III.   CONCLUSION

In accord with the above, the Court hereby ORDERS:

1. The District's motion for summary judgment (Dkt. No. 31) is GRANTED.

2. The District's motion to dismiss (Dkt. No. 9) is DENIED as moot.

DATED this 31st day of March, 2014.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE